IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN PAUL WOODRUFF,              :
                                  :
        Petitioner                :
                                  :      CIVIL NO. 3:CV-06-2310
        v.                        :
                                  :      (Judge Caputo)
TROY WILLIAMSON,                  :
                                  :
        Respondent                :

M E M O R A N D U M

I.      Introduction.

        Kevin Paul Woodruff, a pro se petitioner, has filed a writ of habeas corpus

pursuant to 28 U.S.C. § 2241 and has paid the $5.00 filing fee.[1]  Woodruff, a federal

prisoner challenges the loss of Good Conduct Time ("GCT") as a result of two

separate disciplinary at two different facilities, USP-Victorville, Adelanto, California,

and USP-Lewisburg, Lewisburg, Pennsylvania.  Woodruff also claims he was

transferred to USP-Lewisburg's Special Management Unit ("SMU") in retaliation for

filing administrative remedies and for racially motivated reasons.  While housed in

the SMU, Woodruff states he was denied appropriate medical care for his asthma

and complaints of chest pain.  Finally, Woodruff asserts the Bureau of Prisons

_____

        [1]  Woodruff is presently housed at USP-Big Sandy, Inez, Kentucky.  Although
USP-Big Sandy is not located in the Middle District of Pennsylvania, this Court
retains jurisdiction since Woodruff was in this district when he filed his Petition.  *See
Rumsfeld v. Padilla*, 542 U.S. 426, 441, 124 S.Ct. 2711, 2721, 159 L.Ed.2d 513
(2004)(citing *Ex parte Mitsuye Endo*, 323 U.S. 283, 304, 65 S.Ct. 209, 219, 89 L.Ed.
243 (1944)); *see also* K*ennedy v. Warden, USP Allenwood*, 239 Fed. Appx. 718 (3d
Cir. 2007).

("BOP") has miscalculated his sentence by denying him prior custody credit and disallowing vested GCT.  Woodruff contends the correction of his sentence would result in his immediate release and seeks monetary damages for the remaining charges.  (Doc. 1, Petition.)

For the reasons discussed below, certain claims will be dismissed without prejudice to Woodruff's right to pursue them in a properly filed civil rights complaint. The claims properly brought in this habeas petition will be denied.

## II.    Factual Background.

### A.    Disciplinary Proceedings at USP-Victorville.

On September 13, 2005, Woodruff received an incident report charging him with offense code violations 104, Possession of a Weapon, and 307, Refusing an Order.  (Doc. 15-6, Exhibits in Support of Respondent's Response to the Petition for Writ of Habeas Corpus at R. 21.)[2]  The report, authored by Officer Jarvis, contains the following information:

> On September 12, 2005, at approximately 7:05 p.m., I observed inmate Woodruff, Kevin, Reg. No. 56195-07, holding in his hand a homemade weapon that looked like an ice-pick style metal rod approximately 6 inches long. The inmate was ordered to get on the ground, he did not comply until Tower #7 fired two blast dispersion rounds. At this time Woodruff handed the weapon to inmate Fields, Dwayne, Reg. No. 86688-011, who walked over to a trash can and tried to hide the weapon under it.  The weapon was recovered an placed in evidence.

---

[2]  "R." or "RR." references are to the CM/ECF pagination of the document cited.

(*Id*.)  Photographs of three 6 inch weapons found that day are supplied by

Respondent.  Two of the weapons were found by CO Jarvis.  (*See Id*. at RR.  23 -

25.)  On September 15, 2003, Woodruff attended a hearing conducted by the Unit

Disciplinary Committee ("UDC").  (*Id*. at RR. 21 - 22.)  The UDC referred the matter

to a disciplinary hearing officer ("DHO") for further hearing.  (*Id*.)  Woodruff

requested that the DHO review the video tapes of the yard that day claiming they

would exonerate him of all charges.   (*Id*.)  The UDC advised Woodruff of his rights

before the DHO and he was issued a written copy of the same.  (*Id*. at R. 26.)

Woodruff waived his right to have a staff representative present and his right to call

witnesses before the DHO.  (*Id*. at R. 27.)

The disciplinary hearing was held on September 21, 2005.  Woodruff again

waived his right to a staff representative and after being advised of his rights,

indicating that he understood them, and denied the charges. The DHO recorded his

statement as follows:

> Inmate Woodruff ... stated he saw some other inmates
> outside, so he ran up there to break it up.  Inmate
> Woodruff stated the tower fired a gun shot, and he got
> down.  Inmate Woodruff stated he was told to go around
> the corner, and he did this when staff handcuffed him.
> When questioned by the DHO what his actions were
> when he arrived at the group of other inmates, inmate
> Woodruff stated "Nothing really, I just stood there."

(*Id*. at R. 17.)  In reaching his decision in this matter, the DHO relied upon the

Incident Report and Investigation, a Memorandum authored by CO Jarvis, and

photographs of the weapons found.  (*Id*.)  The DHO informed Woodruff that the

videotape of the events in the yard that day "does not focus on" him.  (*Id*.)

Relying on the greater weight of the evidence, the DHO found Woodruff committed the prohibited act of possession of a weapon and expunged the refusing to obey and order charge.  (*Id.*)

> Specifically, the DHO relies upon the reporting officer's eyewitness observation that the inmate was observed with an ice-pick type weapon, 6 inches in length, in his hand, and handed it over to another inmate.  The DHO compared this observation to the photograph of the weapons which were recovered.  The DHO determined the weapons recovered at the scene of the physical altercation compared to the weapon described by the reporting officer.  The DHO found no reason to question the validity of the reporting officer, since his observatins were made strictly in the performance of his duties, without any reason to submit a falser report.

> The DHO relies upon the photograph of the weapon which depicts an instrument capable of inflicting serious life-threatening injuries.

> The DHO relies upon the inmate's statement at his DHO hearing in which he admitted he voluntarily ran over to a physical altercation which was taking place between other inmates.  The DHO determined the inmate had no business in that area, and did not believe the inmate's version he went to break it up.

(*Id*. at RR. 18 - 19.)  As a result, Woodruff was sanctioned as follows: 40 days loss of GCT; 40 days disciplinary segregation; 20 days disciplinary segregation - suspended pending 6 months clear conduct; 60 days loss of commissary privileges; and 60 days loss of telephone privileges.[3]  (*Id.*)

---

[3]  Respondent concedes that "Woodruff has exhausted with regard to both DHO issues he raises in this petition, and with regard to his challenge to his sentence computation."  (*Id*. at R. 4, Exh. 1, Cunningham Decl. at ¶ 9.)

**B.    Disciplinary Proceedings at USP-Lewisburg.**

On May 23, 2006, Woodruff received an incident report for refusing to provide a urine sample the previous day.  (*Id*. at R. 11.)  On May 22, 2006, at approximately 5:30 p.m., CO Shade "gave inmate Woodruff #56195-097 an order to provide a urine sample for testing.  Inmate Woodruff refused to provide a sample, stating that he already provided a sample this month."  (*Id*.)  Woodruff appeared before the UDC on May 26, 2006, acknowledged that he was advised of his rights before the DHO and understood them, and stated that he "never refused, I'm in disruptive group I piss once a month."  (*Id*.)  Woodruff requested a staff representative and one inmate witness at his DHO hearing. (*Id*. at R. 14.)  At the conclusion of the hearing, the UDC referred the matter to the DHO.  (*Id*. at R. 11.)

On June 5, 2005, the DHO held a hearing at which both Woodruff and his staff representative appeared.  (*Id*. at R. 7.)  The DHO advised Woodruff of his rights and he indicated he understood them.  Woodruff's staff representative indicated that Woodruff wanted to know how many times he could be tested in a month.  (*Id*.)  Woodruff testified that the disciplinary report was false and stated:

> I asked the officer what type of sample I was giving and he said Disruptive Group.  I told the officer that there was a discrepancy because I had already given a DG urine sample for the month.  I wanted to talk to the Lieutenant. I told him I wasn't refusing.  He left my cell and the next morning I got the incident report.  He never gave me the two hour window.

(*Id*.)  Woodruff's inmate witness testified that in response to the officer's request of Woodruff responded "there is a problem because I already gave a DG piss test ...

why don't you call the LT for me because I only get one a month." (*Id*. at R. 8.)  The

witness also stated that the officer responded that "the LT wasn't coming down," and

that the officer didn't come back until later when he told Woodruff he wrote an

incident report.  (*Id*.)  Woodruff did not raise any procedural errors at the hearing.

(*Id*. at R. 7.)

The DHO found Woodruff guilty of the offense of Interfering with Staff, most

like Refusing to Provide a Urine Sample.  (*Id*. at R. 8.)  In making his decision, the

DHO relied on the eyewitness account of the reporting office who stated that at 5:30

p.m., "Woodruff refused to provide a sample, stating that he already provided a

sample this month." (*Id*.)  The also DHO noted that inmates with a disruptive group

assignment are required to provide a urinalysis test once a month, but may be

required to provide samples "under several other categories within that same

month."[4]  (*Id*.)  The DHO examined the urinalysis testing logbook and records, and

learned Woodruff had not provided a urine test under the disruptive group category,

or any other category, during the month of May 2006.  (*Id*.)  According to the log,

Woodruff was last tested on April 27, 2006.  (*Id*.)

The DHO held that although Woodruff claims he did not refuse to provide the

specimen sample, both he and his witness testified that he did not provide the

sample when the officer requested it.  "The DHO relied upon the inmate's

---

[4]  In March 2000, the BOP identified Woodruff as a Disruptive Group Member
due to his affiliation with the Black Guerilla Family, a disruptive group within the
BOP.  His classification was simultaneously altered to reflect him as a Central
Inmate Monitoring case requiring his separation from other inmates currently
confined within the BOP "for the mutual protection of all concerned."  (Doc. 15-6 at
R. 54.)

acknowledgment that he did not provide the reporting officer with a urine sample when requested.  Woodruff would not provide the sample when requested and indicated he wanted to speak to the Lieutenant, who would have been busy monitoring the feeding of the evening meal in the dining room at that time."  (*Id*. at R. 9.)

To the extent Woodruff argued he was denied the two hour time period, as required by policy, "the DHO determined that once Woodruff refused to provide the sample until he saw a Lieutenant, he interfered with the reporting officer while attempting to perform his duty of obtaining a urine test as he had been instructed to do by the SIS, thus negating the two hour requirement provided to inmates to provide urine samples to staff.[5]  The inmate cannot refuse to provide the urine sample when requested by a staff member while attempting to dictate staff actions and response.  Therefore, the greater weight of the evidence supports the finding that Woodruff is guilty of the offense of Interfering with Staff, most like Refusing to Provide a Urine Sample."[6]  (*Id*. at R. 9.)

The DHO imposed the following sanctions: disallowance of 41 days GCT, 30 days, suspended pending 180 days clear conduct; 180 days loss of visiting privileges; and non-contact only visits for 180 days (to begin at the conclusion of the

---

[5]  28 C.F.R. § 550.31 provides "No waiting period ... needs to be allowed for an inmate who directly and specifically refuses to provide a urine sample."  (Doc. 15, Respondent's Response to the Habeas Petition at R. 7, fn. 3.)

[6]  Under 28 C.F.R. § 542.17(f)(1), the DHO may find the inmate committed the prohibited act charged and/or a similar prohibited act if reflected by the incident report.  (*See* Doc. 15 at R. 7.)

loss of visiting privilege sanction).  (*Id*.)

    **C.**   **Woodruff's Placement in the SMU**.

On February 27, 2006, Woodruff was transferred from USP-Victorville to USP-Lewisburg and placed in USP-Lewisburg's SMU.  (Doc. 1, Petition at R. 8.) The SMU is a 12 - 18 month multi-phase program designed to teach inmates self-discipline, prosocial values, and to facilitate an inmate's ability to successfully coexist with members of other geographical, cultural, and religious backgrounds. (Doc. 15-6 at R. 31.)  Successful completion of the program "will allow for [an inmate's] reintegration into general population."  (*Id*.)

Woodruff was referred to the SMU program for receiving an incident report related to the possession of a  dangerous weapon.  (Doc. 22, Petitioner's Traverse at R. 68.)  Prior to his transfer to the SMU, Woodruff received 14 incident reports, some of the more notable incidents are identified as:

        08-15-1998   Possessing a Dangerous Weapon
        05-02-2005   Refusing Work
                         Refusing to Obey an Order
        09-12-2005   Possessing a Dangerous Weapon
        12-20-2005   Fighting with Another Person

(Doc. 15-7 at R. 2.)  Woodruff exhausted his administrative remedies with respect to his SMU placement.  (Doc. 15-6 at R. 4; Doc. 15-7 at RR. 9 - 14.)  Woodruff did not raise the issue of race discrimination or retaliation as a basis of challenging his SMU placement.  Likewise, Woodruff does not complain of the lack of medical care while in the SMU.  (*See* Doc. 15-7 at RR. 9 - 14.)  Respondent notes that as of March 2007, "Woodruff has successfully participated in the SMU program.  He is currently

in phase four of the four part program, and is expected to complete the program at the end of March." (Doc. 15 at R. 9, fn. 9.) Woodruff is currently housed at USP-Big Sandy, thus it is clear that he is no longer being held in USP-Lewisburg's SMU.

### D.   **Computation of Woodruff's Sentence**.

In May 2006, Woodruff filed an administrative remedy request to correct what he perceived to be errors in his sentence calculation. (*See* Doc. 1, Petition at RR. 51 - 58; Doc. 15-7 at RR. 16 - 34.) Specifically, Woodruff seeks reinstatement of 95 days of disallowed GCT that he lost via various disciplinary matters prior to 2005.[7] Woodruff also notes that "from June 17, 1992 to July 26, 1993 [his state] parole was revoked." (Doc. 22, Traverse at R. 21.) He seeks credit for "his parole revocation [as it] was not credited to any other 'time served' on parole." (*Id*. at R. 22.)

While serving a California state parole violation, Woodruff was sentenced on July 14, 1998, in the United States District Court for the Northern District of California, to serve a 235 month prison term. (*Id*. at RR. 26 - 27.) The sentencing court directed that Woodruff receive "credit for time served with the exception to the time defendant was in custody for a probation/parole hold." (*Id*.) Woodruff was paroled from his California State sentence to a federal detainer on July 28, 1993.

---

[7] As a result of disciplinary hearing on the following events, Woodruff incurred a disallowance of 95 days earned GCT:

| | | |
|---|---|---|
| December 28, 2004 | 27 days | Fighting with another Person |
| August 15, 1998 | 41 days | Possession of a Razor Blade Embedded in a Tooth Brush |
| February 1, 1998 | 27 days | Assault on another Inmate |

(*See* Doc. 15-7 at RR. 5 - 7.)

(*Id*. at R. 31.)  Woodruff received jail credit from July 29, 1993 (the day after he was paroled from his California sentence), through July 13, 1998 (the date before his federal sentence began), a total of 1811 days.  (*Id*. at R. 33.)  Woodruff's projected release date is December 30, 2010, via GCT release.  (*Id*.)

Woodruff's anniversary date for the calculation of his GCT is July 29, 1994. (Doc. 15-7, Kerstetter Decl. at R. 23, ¶ 6.)  The BOP has calculated that Woodruff would earn a total of 940 days of GCT between July 29, 1994 and December 20, 2010.[8]  (*Id*.)  As of March 2, 2007, Woodruff had incurred five disciplinary sanctions which resulted in the disallowance of GCT totaling 176 days.[9]  (*Id*. at ¶ 7.) According to the BOP, Woodruff has presently earned 553 days GCT.  If he does not lose any additional GCT due to additional rules infractions, Woodruff will earn a total of 791 days of GCT. (*Id*. at ¶¶ 6 - 8.)

## III.  Discussion.

### A.  Woodruff's Claims Challenging his SMU Administrative Confinement, Racial Discrimination and Denial of Medical Care.

It is well settled that relief requested through a writ of habeas corpus is

---

[8]  The BOP reached this calculation as follows: 54 days multiplied by 17 full years of custody, plus 22 days for the last partial year of custody.  (*Id*.; *see also* Doc. 1, Petition at R. 59 and Doc. 15-7 at R. 34.)

[9]  Woodruff lost GCT on the following dates:

| February 5, 1998 | 27 days (assault charge) |
|---|---|
| August 20, 1998 | 41 days (possession of a weapon) |
| December 28, 2004 | 27 days (fighting) |
| September 21, 2005 | 40 days (possession of a weapon) |
| June 5, 2006 | 41 days (interference with staff in the performance of their duty) |

limited.  *See Leamer v. Fauver*, 288 F.3d 532 (3d Cir. 2002).  The "core of habeas"

lies in a challenge to "the validity of the continued conviction or the fact or length of

the sentence."  *Id.* at 542.  In the context of a federal inmate's

conditions-of-confinement claim, a *Bivens* action, the federal counterpart to a §

1983 claim, is appropriate.  *See Bivens v. Six Unknown Named Agents of the*

*Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971);

*Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004).  Claims that do not directly

implicate the fact or duration of an inmate's confinement may not be pursued by

means of a habeas corpus petition.  *Leamer*, 288 F.3d at 542.

Here, a ruling in Woodruff's favor as to his claims of improper SMU

placement, racial discrimination, and denial of medical care would have no affect on

the fact or duration of his confinement.  Further, he may not receive monetary

compensation, earlier release, or modification of his sentence in response to these

claims.[10]  Thus, his remedy lies not in a habeas corpus action for these claims, but

in a *Bivens* action.  Therefore, as the claims for improper SMU placement, denial of

medical care and race discrimination do not lie at the core of habeas, this claims will

be dismissed without prejudice.  *See McKettrick v. Williamson*, No. 4:CV-06-0543,

2006 WL 1307929, at *2 (M.D. Pa. March 22, 2006)(prisoner's claim regarding

---

[10]  It appears Woodruff filed a *Bivens* complaint before the United States District Court for the Central District of California challenging his SMU placement based on retaliation, race discrimination and denial of access to housing, work and other programs.  (*See* Doc. 22, *Woodruff v. Wrigley*, 2:05-CV-03567-UA-AJW (C.D. Ca.))  Upon review of the docket in that matter, it appears the Court dismissed the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim.  *See Woodruff v. Wrigley*, 2:05-CV-03567-UA-AJW (C.D. Ca. August 18, 2005).

placement in special housing proper under *Bivens*, not § 2241).

   **B.     Loss of GCT Due to Disciplinary Sanctions.**

   "Habeas corpus relief is available to a prisoner who has been sanctioned in violation of due process to a loss of good conduct time." *Robinson v. Warden*, 250 Fed. Appx. 462, 464 (3d Cir. 2007). In *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), the Court observed that, while inmates are entitled to a fair process before GCT may be removed, prison disciplinary hearings "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." An inmate receives adequate due process in an institutional disciplinary proceeding where GCT credits are at risk if given: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence . . .; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985). If these protections are provided and there is "some evidence" to support the resolution of the disciplinary charge, then the Due Process Clause's procedural requirements have been met. *Id.*, 472 U.S. at 454, 105 S.Ct. at 2773. The determination of whether the standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.*, 472 U.S. at

455, 105 S.Ct. at 2774. The standard is met if there was a modicum of evidence from which the conclusion of the tribunal could be deduced. *Id.* Under *Hill*, judicial review of a prison disciplinary decision is limited to ensuring that the prisoner was afforded certain procedures, the action against him was not arbitrary, and that the ultimate decision has some evidentiary support. *Id.*

With regard to the Petitioner's claims of substantive due process or arbitrariness in the disciplinary proceedings at USP-Victorville and/or USP-Lewisburg, we find Woodruff received all procedural due process protection required and there is more than "some evidence" to support Woodruff's guilt as to each charge. In both disciplinary instances, Woodruff received written notice of the charges against him more than 24 hours before the hearing, received a copy of the various incident reports, and initially appeared before the UDC at each facility. In both instances, the UDC referred the matter to the DHO. A review of the record reveals that Woodruff was allowed to attend the hearing and was provided an opportunity to call witnesses, present evidence and have a staff representative if desired. In each instance the DHO prepared a written record of the hearing which document his findings and the evidence upon which he relied, and the reasons for the sanctions imposed. Woodruff does not dispute these findings of fact. He does, however, allege that with respect to the incident at USP-Victorville, where he was accused of possessing a weapon, that a videotape of the incident in the yard that day was exculpatory and yet he was arbitrarily found guilty by the DHO.[11]   As such,

---

[11]  According to Woodruff, SIS Basett "informed Petitioner that the video
(continued...)

Woodruff concludes that the evidentiary standard was not satisfied by the USP-Victorville DHO in reaching his decision in the matter.  We disagree.

The DHO specifically addressed Woodruff's claim as to the exculpatory nature of the videotape.  The DHO "informed the inmate that the video footage does not focus on inmate Woodruff."  (Doc. 15-6 at R. 18.)  Nonetheless, throughout the exhaustion process and these proceedings, Woodruff did not, and has not, provided any evidence to dispute the DHO's finding that the videotape did not focus on Woodruff and thus was not probative to the proceedings.  The DHO relied on the reporting eyewitness officer who said that Woodruff was observed with a weapon in his hand, saw him hand it off to another inmate who disposed of it, and then located two weapons in the area that were similar in size and description as alleged to be in Woodruff's possession.  The DHO also relied upon Woodruff's statement that he was not originally involved in the altercation but "ran over to the incident to break it up" but then did "[n]othing, ... just stood there" when he entered the fray.  (Doc. 15-6 at R. 17.)  "The DHO determined the inmate had no business in the area, and did not believe the inmate's version he went to break it up."  Based on the above, there is clearly sufficient evidence to support the finding that Woodruff was in possession of a weapon that day.

---

[11](...continued)
footage ... does not reveal that Petitioner ever was in possession of any weapon or weapons".  (Doc. 1, Petition at R. 6.)  Woodruff does not offer a declaration of SIS Basett, or a copy of her report, in support of his assertions.  Thus, Woodruff's assertion of what Basett told him was on the tape is inadmissable hearsay.  *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Comp.*, 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993).

As for the disciplinary event at USP-Lewisburg, again Woodruff is not questioning advance notice of the charge, the opportunity to have a staff representative or call witnesses or present evidence.  He again questions the evidentiary standard of the proceedings.  Woodruff claims his request to have the Lieutenant come to the block to resolve whether he had to give a second disruptive group urine sample, when he was under the impression he had already given one that month, did not constitute a refusal to provide the specimen.  As such the officer failed to follow BOP policy by not providing him with a 2 hour window of opportunity to produce the urine sample prior to issuing him a disciplinary incident report.  (Doc. 22, Traverse at RR. 18 - 19.)  Woodruff's witness confirmed that Woodruff requested the officer call the Lieutenant to clarify the situation as he claimed that he had already provided a disruptive group sample that month.  The witness also testified that the officer told Woodruff that the "Lieutenant was not coming down," and that the officer never returned to Woodruff's cell to ask a second time for the specimen.  (Doc. 15-6 at R. 9.)

In this instance, there is some evidence to support the DHO's decision to find Woodruff guilty of interfering with staff, most like refusing to provide a urine sample. The DHO investigated Woodruff's claim that he already provided his disruptive group urine sample for the month of May, and found Woodruff mistaken.  Woodruff had not provided a specimen since April 27, 2006.  Moreover, the DHO found that when Woodruff refused to provide the sample until he spoke to the Lieutenant, he was interfering with the officer while he was attempting to perform his duty of obtaining a urine test as instructed.  (*Id.*)  The DHO perceived this act as an attempt

to dictate staff actions and response.  (*Id.*)  Thus, even where Woodruff does not agree with the DHO's findings, there is some evidence that he attempted to interfere with staff, most like refusing to provide a urine sample.  Because the DHO's decisions are supported by "some evidence" in the record, Woodruff is not entitled to habeas relief on either of his challenges to the disciplinary proceedings that resulted in the loss of GCT.

### C.    Computation of Woodruff's Sentence.[12]

Petitioner's sentence computation argument is two fold.  First, Woodruff claims that the BOP improperly denied him credit for the time period of June 17, 1992 to July 26, 1993, while incarcerated after his California state parole was revoked.  Woodruff claims "his parole revocation was not credited to any other 'time served' on parole."  (Doc. 22 at R. 22.)  Petitioner contends he is entitled to receive credit for this time as his parole violation, and his present federal charge, resulted from the same conduct.  Next, Woodruff alleges that GCT lost in two separate disciplinary incidents in 1998, which occurred after he was paroled from his California sentence and while in federal custody, but before his federal sentence was imposed should be completely restored.  He similarly argues that any GCT earned prior to 2005 was vested, and not subject to disallowance to satisfy future disciplinary sanctions.  As such Woodruff seeks the restoration of 95 days GCT lost

---

[12]  The Court has subject matter jurisdiction under § 2241 to consider the instant subject of the Petition because Woodruff challenges the calculation of his sentence and he was incarcerated in the Middle District of Pennsylvania at the time he filed the Petition.  *See Vega v. United States*, 493 F.3d 310, 313 (3d Cir. 2007)(challenge to BOP's failure to give credit for time served prior to federal sentencing is cognizable under § 2241).

as a result of disciplinary infractions and the restoration vested GCT improperly taken.[13]

The BOP is the agency responsible for implementing and applying federal law concerning the computation of federal sentences. *See, e.g., United States v. Wilson*, 503 U.S. 329, 331, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). In addressing any sentencing computation issue, a district court must consider: (1) when the federal sentence commenced; and, (2) the extent to which the petitioner may be entitled to credit for time spent in custody prior to commencement of the sentence. *See* 18 U.S .C. § 3585; *Chambers v. Holland*, 920 F.Supp. 618, 621 (M.D.Pa.), affd, 100 F.3d 946 (3d Cir. 1996). A federal sentence commences on the date the prisoner is received at the detention facility at which the sentence is to be served. *See* 18 U.S.C. § 3585(a). Section 3585(b) gives the BOP authority to credit against the sentence for time served prior to the commencement of the federal sentence provided that period of time "has not been credited against another sentence."

In this case, Woodruff's sentence commenced on July 14, 1998, the date the sentence was imposed by the United States District Court for the Northern District of California. The next step is computing what prior custody credit, if any, Woodruff is entitled to receive pursuant to 18 U.S.C. § 3585(b).[14] When calculating Woodruff's sentence, the BOP took into account the sentencing court's direction that Woodruff

---

[13] *See* footnote 7, *supra.* for details as to the specific disciplinary incidents in question.

[14] The sentencing court directed that Woodruff was to receive "credit for time served with the exception to the time defendant was in custody for a probation/parole hold." (*See* Doc. 15-7 at R.  23, ¶2, and R. 27.)

was to receive "credit for time served with the exception to the time defendant was in custody for a probation/parole hold."  (*See* Doc. 15-7 at R.  23, ¶2, and R. 27.) The BOP then determined that Woodruff was entitled to 1811 days of prior custody credit for the period from July 29, 1993 through July 13, 1998, which represents the period after he was paroled from his California sentence until the date he was sentenced.  (Doc. 15-7 at R. 33.)  He was not awarded credit for the period of July 17, 1992 through July 26, 1993, the time spent in California state custody serving his parole violation related to his underlying state sentence.

Here, the government correctly asserts that § 3585(b) does not allow the BOP to give Woodruff credit for time spent in state custody prior to his federal sentencing.  It is undisputed that Woodruff was paroled from his state sentence to commence his federal sentence.  Even if it were true that Woodruff's current federal sentence and state parole violation arose from the same conduct, Woodruff is not entitled to credit for the period of July 17, 1992 through July 26, 1993, pursuant to 18 U.S.C. § 3583(b), as this time was credited towards his state sentence resulting in his parole on July 29, 1993, allowing him to commence his federal sentence. Aside from Woodruff's own assertion, there is no evidence before the Court to suggest he did not receive credit for this time period toward his state.  Time spent serving a state parole violation, prior to the commencement of his federal sentence, cannot be credited towards his federal sentence pursuant to 18 U.S.C. § 3585(b) as Petitioner has already received credit for that time frame against his state sentence. *See Vega v. United States*, 493 F.3d 310, 314 (3d Cir. 2007) (the BOP did not err when it disallowed prior custody credit under 18 U.S.C. § 3585(b) because the time

-18-

at issue had been credited against the petitioner's state parole violation); *Rios v. Wiley*, 201 F.3d 257, 269 (3d Cir. 2001)(section 3585(b) does not permit BOP to grant credit for time served that has been credited against defendant's state sentence).  Woodruff, however, did receive 1811 days of prior custody credit pursuant to 18 U.S.C. § 3585(b) for the period of July 29, 1993, the day after his release from the state sentence, through July 13, 1998, the day before commencement of his federal sentence.  Finally, although the federal sentencing court ordered Woodruff's federal sentences to run concurrent to one another, the court specifically held that Woodruff was not to receive credit, towards his federal sentence, for time he was on a probation/parole hold.[15]  Therefore, for the reasons stated above, Woodruff is not entitled to receive credit towards his federal sentence for the approximately 374 days he spent in state custody serving his parole violation prior to the commencement of his federal sentence.

Next, we turn to Woodruff's assertion that because he was sentenced under the Sentence Reform Act of 1984 ("SRA") he is entitled to the restoration of 95 days disallowed GCT for maintaining a disciplinary free period of incarceration. (*See* Doc. 22 at R. 20.)  Alternatively, Woodruff suggests that because he was sentenced under the SRA, once his GCT vested each year on his anniversary, it can not be disallowed at a later time to satisfy past or future disciplinary sanctions once vested. He seeks the restoration of vested GCT that was wrongfully disallowed.

---

[15]  To the extent Woodruff takes issue with the sentencing Court's order, this Court cannot modify the sentencing court's sentencing order.  Without expressing an opinion as to the success of such an effort, Woodruff would have to approach the sentencing court for a modification or amendment to his sentencing order.

The SRA is part of the Comprehensive Crime Control Act of 1984 ("CCCA") which was enacted into law on October 12, 1984, and became effective on November 1, 1987.  The CCCA repealed an earlier GCT statute which applied different rates of GCT for different lengths of sentences and allowed prison officials to withhold or restore credits depending on an inmates subsequent behavior.  The SRA enacted 18 U.S.C. § 3624(b) which provided all prisoners with the same opportunity to earn GCT each year so long as they comply with the BOP's institutional disciplinary rules.  Under the SRA, GCT earned each year is vested at the end of that year and cannot be disallowed in the future.  *See* 18 U.S.C. § 3624(b) (1987).  On September 13, 1994, section 18 U.S.C. § 3624(b) was amended as a result of the enactment of the Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA").  The VCCLEA applied to offenses committed on or after September 13, 1994, but before April 26, 1996, when the Prisoner Litigation Reform Act ("PLRA") went into effect and it was amended again.  Under the PLRA, the amended provision of 18 U.S.C. § 3624(b) provides in pertinent part when GCT vests.  Under the amended version of 18 U.S.C. § 3624(b), effective April 26, 1996, "credit awarded under this provision after the date of the enactment of the Prison Litigation Reform Act shall vest on the date the prisoner is released from custody."

Nonetheless, "[s]entences imposed [for offences committed] between November 1, 1987 to September 12, 1994, are computed under the SRA" and not the PLRA.  *Vitrano v. Marberry*, 2008 WL 471642 (W.D. Pa. Feb. 19, 2008).  Because Woodruff's underlying offense was committed while the SRA was in effect,

-20-

his sentence is governed by the SRA.  The BOP has calculated his sentence accordingly.  *See* Doc. 15-7, R. 32 ("Sentence Procedure: 3559 SRA Sentence, Date of Offense: 03-01-1991").

Under the SRA, Woodruff was eligible to receive 54 days GCT per year, which was awarded at the end of each year of term, i.e. his "anniversary date".  Per BOP calculations, Woodruff's anniversary date is July 29 of each year.  *See* 18 U.S.C. § 3624(b)(1991).  The BOP has 15 days from Woodruff's yearly anniversary date, or until August 12 each year, to determine the amount of GCT to be awarded for that year.  If Woodruff was disallowed GCT to be awarded for that year as a result of disciplinary proceedings, only the remainder of the 54 days will be awarded, and will vest, at that time.  *See Kokoski v. Small*, Civ. No. 5:07-0145, 2008 WL 3200811 at *24 (S.D. W. Va. August 5, 2008)(Slip op.); 18 U.S.C. § 3624(b)(1991).  Credit that has vested may not later be withdrawn, except under very limited circumstances.  *(Id*.)  Credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence.  (*Id*.)  Furthermore, GCT that is disallowed may not be awarded at a later time.  However, if disallowance of GCT is successfully appealed via the BOP's applicable administrative remedy process, or if the BOP has some reason erroneously disallowed the GCT, then the GCT may be credited at that time.

For GCT calculation purposes, Woodruff's first anniversary date is July 29, 1994.  (*Id*. at R. 24.)  It is undisputed that Woodruff earned jail credit from July 29, 1993, through July 13, 1998 (the date before his federal sentence began).  (*See Id*.

at R. 33.)  It is also undisputed that Woodruff earned GCT during this same period

even though he was a pre-trial detainee.  (*See* Doc. 1 at R. 59, and Doc. 15-7 at R.

34.)   The record reveals the following with respect to when, and what GCT,

Woodruff has accrued over the years:

| Time Period | | Disallowed GCT | Vested GCT | Date Vested |
|---|---|---|---|---|
| 07/29/93 | 07/28/94 | 0 | 54 | 08/12/94 |
| 07/29/94 | 07/28/95 | 0 | 54 | 08/12/95 |
| 07/29/95 | 07/28/96 | 0 | 54 | 08/12/96 |
| 07/29/96 | 07/28/97 | 0 | 54 | 08/12/97 |
| 07/29/97 | 07/28/98 | 27 | 27 | 08/12/98 |
| 07/29/98 | 07/28/99 | 41 | 13 | 08/12/99 |
| 07/29/99 | 07/28/00 | 0 | 54 | 08/12/00 |
| 07/29/00 | 07/28/01 | 0 | 54 | 08/12/01 |
| 07/29/01 | 07/28/02 | 0 | 54 | 08/12/02 |
| 07/29/02 | 07/28/03 | 0 | 54 | 08/12/03 |
| 07/29/03 | 07/28/04 | 0 | 54 | 08/12/04 |
| 07/29/04 | 07/28/05 | 27 | 27 | 08/12/05 |
| 07/29/05 | 07/28/06 | 81 | 0 | 08/12/06 |

(*See* Doc. 15-7 at R. 34.)

In February 1998, Woodruff was sanctioned the disallowance of 27 days

GCT after he was found guilty of assaulting another inmate.  In August 1998,

Woodruff was found guilty of possessing a razor blade embedded in a tooth brush.

For this infraction, 41 days GCT was disallowed.  Although these two events

occurred in the same calendar year, they did not appear in the same year of

imprisonment for the purposes of calculating GCT.  Thus, no vested GCT was disallowed as a result of either of this disciplinary sanctions.  As for the December 20, 2004, incident for which Woodruff was found guilty of fighting with others, and where 27 days of GCT were disallowed, this was the only disciplinary sanction where GCT was taken for that year of imprisonment, thus no vested GCT was taken.  In all three incidents, the disallowed GCT was taken during the appropriate term and prior to it vesting during the corresponding anniversary/vesting date.  For the reasons set forth above, Woodruff is not entitled to the restoration of the 95 days disallowed GCT.

Not specifically addressed by Respondent, but clearly raised by this analysis is the question of whether the 81 GCT days were improperly disallowed during Woodruff's July 29, 2005 - July 28, 2006, term.[16]  Clearly, as GCT under the SRA is vested when awarded at the conclusion of each anniversary year, the most GCT an inmate sentenced under the SRA may be disallowed each year is 54 days.  Woodruff believes the entire 81 disallowed GCT was deducted from his earned GCT.  This assumption is incorrect.  It is clear from the record before the Court that only 54 days GCT was disallowed and no vested or future GCT was taken from Woodruff.

---

[16]  The 81 days is a total number of days disallowed as a result of two disciplinary infractions:

|  |  |
| --- | --- |
| September 21, 2005 | 40 days (possession of a weapon) |
| June 5, 2005 | 41 days (interference with staff in the performance of their duty) |

See Doc. 15-7, R. 23, Kerstetter Decl. at ¶ 7.

As of the date of the Response, Woodruff had the potential of earning 702 days GCT.[17]  However, he incurred 5 disciplinary infractions which resulted in him not earning the maximum allowable 54 days GCT per anniversary year.  As discussed above, there is no argument that in 1998, 1999, and 2005, the disallowed GCT was within the appropriate range for each anniversary year.  The only unresolved issue are the 81 GCT disallowed after Woodruff incurred two disciplinary sanctions within the same anniversary year.  Although Woodruff received a total of 81 days disallowed GCT, only the maximum potential number of earned GCT days, 54, were disallowed for the 2006 term.[18]  The additional sanctioned 27 days disallowance of GCT were never subtracted from Woodruff's earned GCT credits because the sanctions disallowed more GCT than Woodruff could earn in a year.  Thus, Woodruff's actual disallowed GCT total is 149 days, not 176 days.  The BOP did not violate the SRA by deducting vested GCT to cover the additional 27 days GCT disallowed in the 2006 anniversary year.  Based on the foregoing, Woodruff's 149 days of GCT were properly disallowed in accordance with the provisions of the SRA.

---

[17]  54 days X 13 years = 702 days GCT

[18]  The Court's calculations are based on the information gleaned from Woodruff's GCT Data (*see* Doc. 15-7 at R.34):

Maximum potential GCT: 54 days X 13 years = 702 days GCT

Actual Disallowed GCT: 27 + 41 + 27 + 54 = 149 days GCT

702 GCT - 149 GCT = 553 Earned GCT

If the entire 176 GCT were disallowed, Woodruff's earned GCT would reflect 526, not 553 days.  (702 - 176 = 526).

**IV.     Conclusion.**

Based on the foregoing, Woodruff's challenge to the loss of GCT as a result of his disciplinary incidents at USP-Victorville, Adelanto, California, and USP-Lewisburg, Lewisburg, Pennsylvania are denied.  Woodruff's claim that he was transferred to USP-Lewisburg's Special Management Unit ("SMU") in retaliation for filing administrative remedies and for racially motivated reasons is denied. Woodruff's denial of medical care claim while housed in the SMU is denied. Wooddruff's claim that the BOP denied him prior custody credit is denied. Woodruff's claim that the BOP violated the SRA by disallowing 27 days vested GCT in the calculation of his sentence is also denied.  Based on the above, Woodruff's Motion to Supplement (doc. 29) and Motion to Expedite (doc. 30) are denied.

An appropriate Order follows.

/s/ A. Richard Caputo
**A. RICHARD CAPUTO**
**United States District Judge**

**Dated: March 12, 2009**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN PAUL WOODRUFF,** | : | |
| | : | |
| **Petitioner** | : | |
| | : | **CIVIL NO. 3:CV-06-2310** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **TROY WILLIAMSON,** | : | |
| | : | |
| **Respondent** | : | |

**O R D E R**

**NOW, THIS 12th DAY OF MARCH, 2009,** in accordance with the foregoing

Memorandum, **IT IS HEREBY ORDERED AS FOLLOWS:**

    1.    Woodruff's Petition for Habeas Corpus (doc. 1) is denied.

    2.    Woodruff's Motion to Supplement (doc. 29) is denied.

    3.    Woodruff's Motion to Expedite (doc. 30) is denied.

    4.    The Clerk of Court is directed to close this case.


                                      **/s/ A. Richard Caputo**
                                      **A. RICHARD CAPUTO**
                                      **United States District Judge**